## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| JERALD S. BATOFF, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 14-6879 |
| JULIE CHARBONNEAU and | : | |
| DEAN TOPOLINSKI, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM

YOHN, J.                                                   September 16, 2015

On April 4, 2012, defendants Julie Charbonneau and Dean Topolinski were living as tenants at Bloomfield, a historic home in Villanova, Pennsylvania, when a fire destroyed the property. Charbonneau subsequently attempted to exercise an option under the lease to purchase Bloomfield from plaintiff Jerald Batoff, the property's owner. During roughly the same period of time, Batoff was negotiating with his insurer, Chartis Property Casualty Company, which ultimately agreed to pay him $18.5 million (plus additional payments already made). Batoff, in turn, agreed to indemnify Chartis against any future claims arising out of the fire. Several rounds of litigation ensued between Batoff and the tenants, leading to a mediated settlement agreement which resulted in a mutual release and the tenants receiving $11 million of the $18.5 million, as well as title to Bloomfield. Charbonneau then filed suit against Chartis, claiming that she had been wrongly denied millions of dollars in additional insurance proceeds. In response, Batoff filed this action against the tenants, alleging breach of contract, fraud, conspiracy, and unjust enrichment. Defendants moved to dismiss. Because Batoff has adequately pleaded all but two of his claims, I will grant the motion in part and deny it in part.

## I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

In January 2011, Jerald Batoff began attempting to sell Bloomfield, a historic house and grounds that he owned in Villanova, Pennsylvania.  First Am. Compl. ("FAC") ¶ 29.[2]  As part of this process, Batoff met with potential buyers Julie Charbonneau and Dean Topolinski in March of 2011.  *Id.* ¶ 31.  During this meeting, Topolinski inquired about the homeowner's insurance then covering Bloomfield, and Batoff provided him with a copy of the policy he held with Chartis Property Casualty Company.  *Id.*  Under this policy, Bloomfield was covered in the event of a casualty up to either $22,372,762 or the total cost of rebuilding the property, known as the "Guaranteed Rebuilding Cost."  *Id.* ¶ 2.  On March 16, 2011, Topolinski agreed to purchase Bloomfield for $5,200,000—plus a cash deposit of $260,000—with closing set for August 1, 2011.  *Id.* ¶ 33.  On July 29, 2011, however, Topolinski told Batoff that he did not have enough available funds to close on Bloomfield as planned.  *Id.*  Instead, Batoff and Topolinski entered into a second agreement of sale on August 1, 2011, with closing set for October 31, 2011, and Topolinski wired a $999,985 deposit to Batoff.  *Id.* ¶¶ 35-36.  The new purchase price for Bloomfield was set at $3.9 million, accounting for the two deposits.  *Id.* ¶ 36.

That same day, Topolinski also agreed to lease Bloomfield from Batoff in advance of the anticipated closing.  *Id.* ¶ 37.  Topolinski specifically ensured that Batoff would continue to pay the homeowner's insurance premiums throughout the lease period.  *Id.* ¶ 38.  Charbonneau and Topolinski then took residence at Bloomfield, before Topolinski was unable to close for a second time.  *Id.* ¶ 40.  On or around November 14, 2011, Batoff and Charbonneau signed a new, five-

---

[1] This account accepts as true all factual allegations made in plaintiff's first amended complaint (Doc. No. 16).  *See Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir. 1996).

[2] The amended complaint does not refer to the property at issue as Bloomfield, but I have done so throughout several pieces of related litigation.  *See Charbonneau v. Chartis Prop. Cas. Co.*, No. CIV.A. 13-4323, 2015 WL 3999592 (E.D. Pa. July 1, 2015); *Batoff v. Charbonneau*, No. 12-CV-05397, 2013 WL 1124497 (E.D. Pa. Mar. 19, 2013). For the sake of consistency, I will therefore continue to use the name Bloomfield here as well.

year lease-option agreement ("LOA") for Bloomfield.  *Id.* ¶¶ 47-48.[3]  Under the LOA,

Charbonneau had the option to purchase Bloomfield during the lease period for $3.9 million,

upon payment of a non-refundable $900,000 deposit.  *Id.* ¶ 48.  The LOA further provided that,

in the event that Bloomfield suffered a casualty during the lease period costing more than $1

million to repair, Charbonneau could likewise exercise her option, and that she would also be

"entitled to receive at closing a credit in the amount of any insurance proceeds paid to [Batoff],

and an assignment [of Batoff's] rights to receive any unpaid proceeds."  *Id.* ¶ 49.  The same

clause stated that "[l]andlord may make proof of loss; provided, however, that any adjustment of

a proof of loss shall require the prior written consent of Tenant, which shall not be unreasonably

withheld or delayed."  *Id.*  Topolinski later wrote out and signed a "joinder" of the LOA, stating

that he "join[s] in as a party to the [LOA] . . . as a guarantor."  *Id.* ¶ 56 (citing *id.* Ex. E).

At 2:30 pm on April 4, 2012, plaintiff alleges Bloomfield was consumed and destroyed

by fire.  *Id.* ¶ 63.  Topolinski subsequently requested a copy of Batoff's homeowner's insurance

policy with Chartis.  *Id.* ¶ 68.  The policy provided for a coverage limit for Bloomfield of

$22,373,762.  *Id.* ¶ 69.  The policy further states that, under its "Guaranteed Rebuilding Cost"

provision, Chartis "will pay the reconstruction cost of your house or other permanent structure,

for each occurrence, even if this amount is greater than the amount of coverage shown on the

Declarations Page."  *Id.*  A payment of the Guaranteed Rebuilding Cost, however, requires that

"you must repair or rebuild your home or other permanent structure at the same location."  *Id.*

On April 8, 2012, Batoff, Charbonneau, and Topolinski retained the public adjusting firm Clarke

& Cohen to assist with filing their respective insurance claims arising out of the fire.  *Id.* ¶ 70.

---

[3] The amended complaint first states that Batoff and Topolinski signed the November 2011 lease, *see* FAC ¶ 47 (citing *id.* Ex. E), then asserts that the lease was signed by Charbonneau, but not Topolinski, who instead signed a guaranty, *see id.* ¶ 48 (citing *id.* Ex. F).  Exhibit E shows that only Charbonneau signed the November 2011 lease, *see id.* Ex. E (Doc. No. 16-5) at 10, so I will assume that to be true for the purposes of this motion.

On July 25, 2012, Batoff sent a letter to Charbonneau, stating that she was in default under the LOA and that "no binding Option to purchase the property was ever in existence." *Id.* ¶ 74. Charbonneau responded with a letter to Batoff on August 7, 2012, attempting to cure the alleged default and exercise her option under the LOA. *Id.* ¶ 75. In that letter, Charbonneau demanded that closing on the sale of Bloomfield be set for September 8, 2012. *Id.* ¶ 76. In response, on August 15, 2012, Batoff sued Charbonneau and Topolinski in the Delaware County Court of Common Pleas, and the case was subsequently removed to this district. *Id.* ¶¶ 78-79; *see also Batoff v. Charbonneau* (*Batoff I*), No. 12-cv-5397-WY (E.D. Pa. Sept. 21, 2012).

On October 1, 2012, Chartis and Batoff reached a settlement of Batoff's insurance claim, under which Chartis agreed to pay a total of $20.5 million (including certain payments already made). FAC ¶ 80. The same day, Charbonneau and Topolinski filed counterclaims in *Batoff I*, seeking in part specific performance on the sale of Bloomfield and a declaration of their right to participate in the adjustment of the Chartis homeowner's insurance claim. *Id.* ¶ 81. On or about October 16, 2012, Batoff's counsel notified Charbonneau and Topolinski that Batoff had settled his claim with Chartis. *Id.* ¶ 82. On October 22, 2012, Charbonneau and Topolinski filed amended counterclaims in *Batoff I*, seeking, *inter alia*, $14 million in lost insurance proceeds because Batoff had settled his Chartis claim without their consent and without seeking what they alleged to be the full cost of rebuilding Bloomfield, approximately $35 million. *Id.* ¶ 85. Charbonneau and Topolinski also sought a temporary restraining order to freeze the Chartis policy proceeds, which was granted. *Id.* ¶ 86.

On November 29, 2012, Batoff filed a second suit against Charbonneau and Topolinski. *Id.* ¶ 87; *see also Batoff v. Topolinski* (*Batoff II*), No. 12-cv-6673-WY (E.D. Pa. Nov. 29, 2012). In that case, Batoff claimed that Charbonneau and Topolinski committed arson and intentionally

destroyed Bloomfield.  FAC ¶ 88.  *Batoff I* and *Batoff II* were then consolidated, and during

discovery in the consolidated litigation around December 2012, Charbonneau and Topolinski

were made aware of the terms of the release between Batoff and Chartis, which was part of the

settlement over insurance proceeds for Bloomfield.  *Id.* ¶ 89-90.  The release provided that

Batoff would indemnify Chartis against any "demands, liabilities, losses, damages, costs, fees

(including legal fees) or expenses of whatever nature or kind incurred as the result of any claim,

demand, damages, action, or other form of proceeding of any kind whatsoever that may be

asserted against them . . . by Topolinski and/or Charbonneau (whether jointly or severally) or any

other claimant, for proceeds of or payments pursuant to the Policy arising out of the Leases . . .

and/or the Option."  FAC Ex. B ¶ 4; *id.* ¶ 91.  Batoff alleges that, as a result, Charbonneau and

Topolinski were aware as of December 2012 that a lawsuit against Chartis for proceeds above

what Batoff had already obtained from Chartis in their October 1, 2012 settlement "would be

effectively making another claim against [Batoff]."  *Id.* ¶ 92.

In early 2013, Charbonneau suggested the possibility of a mediation with Batoff to

Damon Faunce of Clarke & Cohen.  *Id.* ¶ 93.  Faunce and Richard Cohen, also of Clarke &

Cohen, thereafter proposed a mediation between Batoff, Charbonneau, and Topolinski to resolve

the dispute over insurance proceeds for Bloomfield and the consolidated litigation.  *Id.*

Topolinski allegedly insisted that he and Charbonneau would only participate in a mediation if

Batoff agreed that the parties "would have no lawyers at the mediation and would not contact or

involve lawyers during the mediation or to finalize any agreement reached at the mediation."  *Id.*

¶ 94.  At this mediation, Batoff would be represented by Cohen, while Charbonneau and

Topolinski would be represented by Faunce.  *Id.* ¶ 95.  Batoff, Charbonneau, and Topolinski

allegedly all agreed that they "would not be represented by lawyers or contact their lawyers

during the mediation." *Id.* On March 27-28, 2013, Batoff, Charbonneau, and Topolinski signed

an agreement to enter mediation, which listed the intended participants as Batoff, Charbonneau,

Topolinski, Cohen, and Faunce. *Id.* ¶ 96; *see also id.* Ex. H.

      The mediation was held on April 5, 2013, with Batoff, Charbonneau, Topolinski, Faunce,

and Cohen present. *Id.* ¶ 102. The result of the mediation was a signed agreement under which

Charbonneau and Topolinski received $11,000,000 of the insurance proceeds that Chartis had

paid to Batoff, Batoff kept the remaining $6,430,000, the *Batoff I* and *Batoff II* lawsuits would be

dismissed with prejudice, the parties agreed to a mutual release, and title to Bloomfield would

pass to Charbonneau. *Id.* ¶ 104-05. This deal was memorialized in a settlement agreement and

mutual release dated April 5, 2013. *Id.* ¶ 105. Specifically, the release provided:

> [T]he parties hereto mutually release and forever discharge each other from and
> against any and all claims, demands, causes of action, obligations, damages, and
> liabilities, specifically including but not limited to any claims asserted directly or
> indirectly in [*Batoff I* and *Batoff II*], which the parties ever had, now have, or
> hereafter may have or claim to have against each other from the beginning of time
> up through the effective date of this Agreement. For the avoidance of doubt, this
> release includes all claims held by the parties personally, as well as any claims
> that may have been assigned to the parties by others, including, but not limited to,
> claims that may have been assigned by Chartis Property Casualty Co. to Batoff.

*Id.* Ex. G at 5 ¶ 4.[4] Allegedly, Topolinski called his attorney several times during the course of

this mediation, seeking advice on how to "preserve a future lawsuit against Chartis" while

knowing that Batoff "would be asked to indemnify the defense of the lawsuit against Chartis and

potentially satisfy a judgment for additional insurance proceeds." *Id.* ¶ 106. Indeed, Batoff

asserts that the text of the release "was particularly crafted by Defendants and their concealed

counsel to appear to end all litigation arising from the fire that destroyed [Bloomfield] . . .

without in fact precluding Defendants from proceeding with a further action against Chartis." *Id.*

¶ 109. Batoff alleges that Charbonneau and Topolinski gave no notice to himself or Cohen that

---

[4] The Settlement Agreement contains a numbering error, so I have cited page and paragraph for the sake of clarity.

they intended to bring such a future lawsuit against Chartis, *id.* ¶ 103, and that he would not have entered into the Settlement Agreement had he known of the tenants' true intent, *id.* ¶ 107.

Batoff filed a stipulation to dismiss *Batoff I* and *Batoff II* on May 21, 2013.  *Id.* ¶ 112. On July 25, 2013, Charbonneau filed suit against Chartis.  *Id.* ¶ 113; *see also Charbonneau v. Chartis Prop. Cas. Co.*, 13-cv-4323-WY (E.D. Pa. July 25, 2013).  In that case, Charbonneau sought additional insurance proceeds from Chartis under provisions of the LOA.  *Id.* ¶¶ 114-15. Batoff asserts that he has paid the cost of defending Chartis under the terms of their October 1, 2012 agreement, and that these fees exceed $500,000.  *Id.* ¶ 117.

Batoff filed this case against Charbonneau and Topolinski on December 3, 2014.  Doc. No. 1.  Defendants filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6) on December 24, 2014.  Doc. No. 8.  Batoff then filed an amended complaint on January 13, 2015.  Doc. No. 16. Defendants again moved to dismiss under Rule 12(b)(6) on January 26, 2015.  Doc. No. 23. Batoff filed a response in opposition on February 9, 2015, and defendants replied on February 17, 2015. Doc. No. 27, 31.  Batoff then filed a sur-reply on February 24, 2015.  Doc. No. 36.

## II.     STANDARD OF REVIEW

In evaluating a motion to dismiss under Rule 12(b)(6), courts must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 233 (3d Cir. 2008) (internal quotation marks and citation omitted).  The pleading standard of Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555

(2007)).  The complaint must contain sufficient factual matter to be plausible on its face.  *See id.*

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged"; a sheer

possibility that a defendant acted unlawfully is not sufficient.  *Id.*  Therefore, to survive a motion

to dismiss, plaintiffs must allege facts sufficient to have "nudged their claims across the line

from conceivable to plausible."  *Twombly,* 550 U.S. at 570.

Count III of the complaint, claiming fraud, is additionally covered by the heightened

pleading standards of Rule 9, which states that "[i]n alleging fraud or mistake, a party must state

with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  This

particularity requirement is designed "to place the defendants on notice of the precise

misconduct with which they are charged, and to safeguard defendants against spurious charges of

immoral and fraudulent behavior."  *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742

F.2d 786, 791 (3d Cir. 1984).  The Third Circuit has therefore interpreted Rule 9(b) to mean that

a plaintiff bringing a fraud claim must generally "plead the who, what, when, where and how:

the first paragraph of any newspaper story," *Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d

242, 253 (3d Cir. 2009) (internal quotation marks omitted), or "otherwise inject precision or

some measure of substantiation into a fraud allegation," *Frederico v. Home Depot*, 507 F.3d 188,

200 (3d Cir. 2007).

## III.   DISCUSSION

Batoff brings five claims against Charbonneau and Topolinski in his amended complaint:

breach of the March 28, 2013 mediation agreement (Count I), breach of the April 5, 2013

settlement agreement (Count II), fraud (Count III), conspiracy (Count IV), and unjust enrichment

(Count V).  I will address each in turn.

A.     **Breach of the March 28, 2013 Mediation Agreement**

"Pennsylvania law requires that a plaintiff seeking to proceed with a breach of contract action must establish '(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages.'"  *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (citing *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).  In Count I of the amended complaint, the contract at issue is an agreement to engage in mediation (the "Mediation Agreement"), executed by Batoff, Charbonneau, and Topolinski (as well as Cohen and Faunce) on March 28, 2013.  FAC Ex. H.  Batoff alleges that, before the Mediation Agreement was drafted, "Topolinski insisted that he and Charbonneau would only agree to participate in mediation if [Batoff] would agree that the parties would have no lawyers at the mediation and would not contact or involve lawyers during the mediation or to finalize any agreement reached at the mediation."  *Id.* ¶ 94.  Batoff so agreed.  *Id.* ¶ 96.  Batoff further asserts that after the Mediation Agreement was signed, "Charbonneau and Topolinski reaffirmed their commitment and agreement to the precondition to the mediation, specifically that the parties agreed that the mediation would be held without the participation and assistance of counsel at the mediation and/or in the drafting of any settlement agreement reached at the mediation."  *Id.* ¶ 122.  Batoff claims that defendants breached this "precondition" by contacting their attorney during the mediation, and that as a result, he has suffered more than $500,000 in damages thus far.  *Id.* ¶¶ 123-24.

Defendants correctly note that the Mediation Agreement itself does not include any language about whether participants in the mediation may consult with counsel.  *See id.* Ex. H. As a result, any claim about breach of such a provision necessarily relies on parol evidence—that is, "extrinsic evidence of negotiations that occurred before or while the agreement was being

reduced to its final written form." *See* Parol-Evidence Rule, *Black's Law Dictionary* (10th ed. 2014).  However, the Pennsylvania Supreme Court has long held that, under the parol evidence rule, courts may only consider such extrinsic evidence in certain, narrow circumstances, namely:

> Where the parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement.  All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract . . . and unless fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and its terms and agreements cannot be added to nor subtracted from by parol evidence.

*Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 436 (Pa. 2004) (quoting *Gianni v. Russell & Co.*, 126 A. 791, 792 (Pa. 1924)).  Moreover, "[w]here the parol evidence rule will bar the admission of statements necessary to establish a contract or tort claim, a court may properly grant a motion to dismiss."  *Ross v. Meyer*, No. CIV.A. 12-0998, 2014 WL 2800748, at *11 (E.D. Pa. June 19, 2014); *see also Yocca*, 854 A.2d at 438 ("Having determined that the . . . Agreement was the parties' whole contract and cannot be supplemented by the parties' previous negotiations or agreements . . .  we agree with the trial court's conclusion that Appellees' breach of contract claims must be dismissed.").  I must therefore consider whether the parol evidence rule applies to the Mediation Agreement as part of evaluating defendants' motion to dismiss.

The parol evidence rule applies where "a writing . . . represents the 'entire contract between the parties.'"  *Yocca*, 854 A.2d at 437 (quoting *Gianni*, 126 A. at 792).  However:

> [P]arol evidence may be introduced to vary a writing meant to be the parties' entire contract where a party avers that a term was omitted from the contract because of fraud, accident, or mistake.  In addition, where a term in the parties' contract is ambiguous, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is created by the language of the instrument or by extrinsic or collateral circumstances.

*Id.* (citations and internal quotation marks omitted).  Here, the Mediation Agreement provides that "[t]he mediation shall be attended solely by [Batoff, Topolinski, Charbonneau], Damon

Faunce, Richard Cohen, and the mediator," and there is nothing in the text about whether parties may contact persons not in attendance. FAC Ex. H. Thus, if the Mediation Agreement is the "entire contract" between the parties (despite its lacking an integration clause), the parol evidence rule would apply, but extrinsic evidence could still be introduced to address the ambiguity of the word "attended," which would necessarily shed light on what role, if any, outside attorneys were expected to play in the mediation process. And, if the Mediation Agreement is not the "entire contract" between the parties, the parol evidence rule does not apply whatsoever. In either event, therefore, extrinsic evidence may be introduced as to whether the parties intended to bar communication with attorneys during the mediation, as Batoff alleges.[5] Assuming plaintiff's factual allegations to be true, as I must at this stage, Batoff has made out a plausible claim for breach of the Mediation Agreement. Accordingly, I will deny the motion to dismiss with respect to Count I of the amended complaint.

### B.      Breach of the April 5, 2013 Settlement Agreement

Again, "Pennsylvania law requires that a plaintiff seeking to proceed with a breach of contract action must establish '(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages.'" *Ware*, 322 F.3d at 225 (citing *CoreStates Bank*, 723 A.2d at 1058). In this count, Batoff asserts that Charbonneau and Topolinski breached the April 5, 2013 settlement agreement (the "Settlement Agreement") by filing suit in *Charbonneau v. Chartis Property Casualty Co.*, 13-cv-4323-WY (E.D. Pa. July 25, 2013), and that he has consequently suffered at least $500,000 in damages because he is obliged

---

[5] Consequently, defendants will be able to introduce their own evidence that the Mediation Agreement was never intended to bar contact with outside counsel, including the text of the Settlement Agreement that stemmed from the mediation, which included an acknowledgment that "each [party] has had the opportunity to consult with an attorney of its choice to explain the terms of this Agreement and the consequences of signing it," as well as a representation and warranty that "[e]ach party has had the opportunity to receive independent legal advice from an attorney if it so chose with respect to the content and advisability of making this Agreement." FAC Ex. G at ¶¶ 16, 20(b). These provisions would seem to substantially contradict plaintiff's claim in Count I.

to indemnify Chartis in that case under the terms of their October 1, 2012 settlement.  FAC

¶¶ 127-33.  Defendants do not dispute the existence of the contract or the claim of damages.[6]  So

the motion to dismiss turns on whether Batoff has plausibly alleged breach of contractual duty.

Batoff points to two provisions in the Settlement Agreement that he believes were

breached by the filing of *Charbonneau v. Chartis*.  First is the "Mutual Release," which states:

> [T]he parties hereto mutually release and forever discharge each other from and
> against any and all claims, demands, causes of action, obligations, damages, and
> liabilities, specifically including but not limited to any claims asserted directly or
> indirectly in [*Batoff I* and *Batoff II*], which the parties ever had, now have, or
> hereafter may have or claim to have against each other from the beginning of time
> up through the effective date of this Agreement.

FAC Ex. G at 5 ¶ 4.  Batoff argues that *Charbonneau v. Chartis* wrongly exposes him to exactly

such "obligations, damages, and liabilities" due to his obligation to indemnify Chartis.  Pl.'s

Resp. 20.  Second is the "Covenant Not to Sue," which provides that the parties "will not make,

assert, or maintain against any party they released in the Agreement, any claim, demand, action,

or suit arising out of or in connection with the matters respectively released in this Agreement."

FAC Ex. G at ¶ 6.  Batoff contends that the "broad and general" language of this provision was

meant to include "all types of claims arising out of any of the matters released in the agreement,"

which necessarily encompasses the claims by Charbonneau against Chartis.  Pl.'s Resp. 23.

These arguments do not bear scrutiny, as I previously held in ruling on Chartis's motion

to dismiss in *Charbonneau v. Chartis*.  There, Chartis argued that the Settlement Agreement

barred Charbonneau from filing suit against the insurer.  The court explained:

> The Batoff/Charbonneau settlement was an accord between Batoff and
> Charbonneau that satisfied the claims Batoff made against Charbonneau. The

---

[6] However, defendants correctly note that Charbonneau alone, not Topolinski, brought suit against Chartis.  Even assuming as true for the purposes of this motion Batoff's allegation that Charbonneau filed the case "with the agreement and participation" of Topolinski, the Settlement Agreement does not prohibit agreeing with or participating in the claims of others; rather, it bars only "mak[ing], assert[ing], or maintain[ing]" such claims.  FAC Ex. G at ¶ 6.  At the outset, therefore, I will dismiss Count II of the amended complaint as against Topolinski.

> settlement was in no way an accord between Charbonneau and Chartis, nor did it
> settle or in any way involve the claims Charbonneau now makes.  Similarly the
> release in the Batoff/Charbonneau settlement released Batoff from any further
> related claims Charbonneau might have.  As clearly stated, the release applies "to
> any claim asserted directly or indirectly in the Civil Actions, which the parties
> ever had, now have, or hereafter may have or claim to have *against each other*"
> (emphasis added).  Thus, the release is limited to claims the parties have "against
> each other."  As Chartis was not a party to the Batoff/Charbonneau settlement, it
> does not benefit from the release.

*Charbonneau v. Chartis Prop. Cas. Co.*, No. CIV.A. 13-4323, 2014 WL 1259567, at *5 (E.D.

Pa. Mar. 26, 2014).  That reasoning equally applies here: the release between Batoff and

Charbonneau did not cover claims that Charbonneau may have had against Chartis, so that same

release could not have been breached when Charbonneau actually brought those claims against

Chartis.  Likewise, the covenant not to sue applies only to parties "released in this Agreement."

FAC Ex. G at ¶ 6.  Chartis was not released in the Settlement Agreement, and any claim that

Batoff may ultimately face pursuant to his duty to indemnify will come from Chartis, not

Charbonneau.  Indeed, Batoff has not cited a single case, let alone one binding on this court, to

bolster his argument that a claim against an indemnified party operates as an "indirect claim"

against the indemnitor.[7]  *See* Pl.'s Resp. 23-24.  Nor have I found any such decision.  Batoff's

breach of contract claim regarding the Settlement Agreement must therefore fail as a matter of

law, and so I will grant the motion to dismiss with respect to Count II of the amended complaint.

## C.    Fraud

In Pennsylvania, a common law fraud claim requires plaintiff to prove:

> (1) a representation; (2) which is material to the transaction at hand; (3) made
> falsely, with knowledge of its falsity or recklessness as to whether it is true or
> false; (4) with the intent of misleading another into relying on it; (5) justifiable
> reliance on the misrepresentation; and (6) the resulting injury was proximately
> caused by the reliance.

---

[7] Moreover, the "indirect" language of the release relates only to the "specifically included but not limited to any
claim asserted directly or indirectly in [Batoff I and Batoff II]" language not the general release language before and
after that clause.  Chartis was not a party in Batoff I or Batoff II.

*Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994).

Plaintiff alleges that defendants intentionally concealed and acted to deliberately mislead plaintiff by "fraudulent misrepresentations that the mediation of the consolidated lawsuits would be conducted without the involvement of attorneys when in fact Defendants consulted their lawyers prior to and during the mediation and the drafting of the Mediated Settlement Agreement." FAC Exhibit H ¶ 136. In addition he alleges that defendants deliberately misled and lulled plaintiff into believing that defendants "intended to settle any and all claims to any insurance proceeds from Plaintiff's Chartis Homeowner's Policy when Defendants planned to institute a new lawsuit indirectly against Plaintiff." *Id.* ¶ 137. Plaintiff also alleges that defendants so acted knowing that plaintiff wished to settle all further litigation arising out of any dispute arising from the fire at the home and any insurance proceeds applicable thereto. *Id.* ¶ 138. Plaintiff also alleges that terms relating to the parties' agreement that the Settlement Agreement would be reached without participation and/or advice of counsel were fraudulently omitted from the Settlement Agreement and/or omitted by accident or mistake by defendants. *Id.* ¶ 140.

Batoff's fraud claim centers on the Settlement Agreement, and at the outset, defendants argue that such a claim must fail because the Settlement Agreement contains a "Subsequent Discovery of Different or Additional Facts" clause, stating:

> The parties hereto acknowledge that they are aware that they may hereafter discover facts different from or in addition to those they now know or believe to be true with respect to the claims, causes of action, rights, obligations, and liabilities herein released, and each agrees that the within release shall be and remain in effect in all respects as a complete release as to all matters released herein, notwithstanding any such different or additional facts.

FAC ¶ 5.  Indeed, defendants emphasize that this clause "applies to 'any such different or additional facts,' making no exception for facts allegedly leading to the fraudulent omission of contractual provisions."  Mot. Dismiss 17.  On its face, however, this provision does not prohibit Batoff from claiming that he subsequently discovered that the terms of the contract itself were different from what the parties allegedly agreed upon, rather than the facts on which those terms were premised.  I will thus consider the fraud claim on its merits.

Pennsylvania recognizes two types of fraud claims that can be brought, as here, in relation to a contract: fraud in the inducement and fraud in the execution.  Fraud in the inducement is found where "an opposing party made false representations that induced the complaining party to agree to the contract," while fraud in the execution exists when "a term was fraudulently omitted from the contract."  *Toy v. Metro. Life Ins. Co.*, 928 A.2d 186, 204-05 (Pa. 2007) (quoting *Yocca*, 854 A.2d at 437 n.26).  Count III of the amended complaint is styled simply as "Fraud," so as an initial matter it is difficult to determine which type of claim Batoff is raising.  *See* FAC at 32.  On one hand, the majority of the allegations in this count are lifted directly (or with only slight changes) from Count II of Batoff's original complaint, which was styled as "Fraud in the Inducement of the Mediated Settlement Agreement."  *See* Compl. at 35.  Likewise, in the amended complaint, Batoff asserts that "[d]efendants intentionally through . . . false representations, false assurances, and other acts and omissions caused [him] to enter into the Mediated Settlement Agreement," which clearly sounds under fraud in the inducement.  FAC ¶ 147.  On the other hand, three paragraphs added in the amended complaint state that terms were "fraudulently omitted from the Mediated Settlement Agreement," and two revised paragraphs directly refer to "fraud in the execution."  *See* FAC ¶¶ 140-142, 146, 148.  For the

avoidance of doubt, therefore, I will analyze Count III of the amended complaint under

Pennsylvania's standards for both fraud in the inducement and fraud in the execution.

### 1.    *Fraud in the inducement*

In Pennsylvania, claims of fraud in the inducement are subject to the parol evidence rule.

*Toy*, 928 A.2d at 206.  Thus, if the court finds that the agreement at issue constitutes "a writing

that represents the 'entire contract between the parties,'" then the court may not consider

"preliminary negotiations, conversations[,] verbal agreements," or any other extrinsic evidence

of representations made by the parties prior to the execution of the written contract.  *Yocca*, 854

A.2d at 437 (quoting *Gianni*, 126 A. at 792).  As the Pennsylvania Supreme Court has explained:

> To determine whether or not a writing is the parties' entire contract, the writing
> must be looked at and if it appears to be a contract complete within itself, couched
> in such terms as import a complete legal obligation without any uncertainty as to
> the object or extent of the [parties'] engagement, it is conclusively presumed that
> [the writing represents] the whole engagement of the parties . . . .  An integration
> clause which states that a writing is meant to represent the parties' entire
> agreement is also a clear sign that the writing is meant to be just that and thereby
> expresses all of the parties' negotiations, conversations, and agreements made
> prior to its execution.

*Id.* at 436 (citations and internal quotation marks omitted).  Here, the contract at issue is the

Settlement Agreement, which contains the following provision:

> The undersigned each acknowledge and represent that no promise or
> representation not contained in this Agreement, or in any exhibit hereto, has been
> made to them, and that this Agreement contains the entire understanding and
> agreement between the parties, and it contains all terms and conditions pertaining
> to the compromise and settlement of the disputes referenced in this Agreement.
> The undersigned further acknowledge that the terms of this Agreement are
> contractual and not merely a recital, and that this Agreement is fully integrated.

FAC Ex. G ¶ 17.  Based on this integration clause and a review of the contract as a whole, the

Settlement Agreement clearly represents the entire contract between the parties.  The parol

evidence rule therefore applies, and, as a result, the court would not be able to consider any

extrinsic evidence of representations made prior to or during the contract negotiation—that is, the evidence necessary to make out a claim of fraud in the inducement. "Where the parol evidence rule will bar the admission of statements necessary to establish a contract or tort claim, a court may properly grant a motion to dismiss." *Ross*, 2014 WL 2800748 at \*11. Thus, to the extent that Count III of the amended complaint is read as claiming fraud in the inducement, it must be dismissed at this stage.

### 2.   *Fraud in the execution*

Count III of the amended complaint could also be viewed as bringing a claim of fraud in the execution, which occurs where "a party alleges that he was mistaken as to the terms and the actual contents of the agreement he executed due to the other's fraud." *Toy*, 928 A.2d at 205. Unlike with fraud in the inducement, Pennsylvania recognizes an exception to the parol evidence rule for claims of fraud in the execution. Specifically, in *Toy*, the Pennsylvania Supreme Court stated that "parol evidence may be introduced to vary a writing meant to be the parties' entire contract[] when a party avers that the contract is ambiguous or that a term was omitted from the contract because of fraud, accident or mistake." *Id.* at 204. Thus, "when fraud in the execution is alleged, representations made prior to contract formation are not considered superseded and disclaimed by a fully integrated written agreement, as they are when fraud in the inducement is asserted." *Id.* at 206-07. Here, Batoff alleges that terms "relating to the parties' agreement that the Mediated Settlement Agreement was reached without the participation and/or advice of counsel," terms that "reflect the parties agreement that any and all claims to any additional insurance proceeds under the Chartis policy were forever barred," and terms that "would have prevented the institution of a new lawsuit against Chartis" were all "fraudulently omitted" from the Settlement Agreement "and/or omitted by accident or mistake by Defendants (on advice of

their counsel)."  FAC ¶¶ 140-42.  The Pennsylvania Supreme Court has unequivocally stated that "the parol evidence rule is not applied to a fraud in the execution of a contract claim."  *Toy*, 928 A.2d at 206.  I am therefore required not to apply the parol evidence rule to Batoff's fraud claim, at least to the extent that this claim can be viewed as one of fraud in the execution.[8]  Because Batoff further alleges that these fraudulent omissions were material to the Settlement Agreement, knowingly false, made with the intent to mislead him into relying on them, justifiably relied upon, and resulted in injury (namely, the costs of indemnifying Chartis), the amended complaint makes out a prima facie claim of fraud in the execution.  FAC ¶¶ 143-51; *see also Gibbs*, 647 A.2d at 889.  Moreover, Batoff has pleaded the "who, what, when, where and how" of this claim such that the particularity requirements of Rule 9(b) are satisfied.  *See Institutional Investors Grp.*, 564 F.3d at 253.  Accordingly, I will deny the motion to dismiss as to Count III of the amended complaint, with the understanding that Count III claims fraud in the execution, not fraud in the inducement.

---

[8] In a footnote in *Toy*, the Pennsylvania Supreme Court explained why the parol evidence rule applies to claims of fraud in the inducement, but not fraud in the execution:

> First, the policy that the parol evidence rule aims to serve, which is to uphold the integrity of the written contract because that writing is considered the embodiment the parties' true agreement, is not furthered by a refusal to recognize the fraud in the execution exception, as it is in refusing to recognize an exception for fraud in the inducement.  This is so because in the fraud in the execution context, the allegation is that the written agreement is not the expression of the parties' true and complete contractual intent inasmuch as terms that were agreed to by the parties were omitted from that writing through fraud.  Second, if a party were allowed to introduce representations made prior to contract formation that contradicted or varied the terms of his written contract by merely alleging that the representations were fraudulent, the fraud exception could swallow the rule.

*Toy*, 928 A.2d at 206 n.24 (citations omitted).  Here, Batoff alleges that terms stating that the Settlement Agreement "was reached without the participation and/or advice of counsel" were fraudulently omitted from the contract.  FAC ¶ 140.  But such terms, if present, would conflict with text that actually was included in the contract—specifically, each party acknowledged that it "had the opportunity to consult with an attorney of its choice to explain the terms of this Agreement and the consequences of signing it" and each party represented and warranted that it "had the opportunity to receive independent legal advice from an attorney if it so chose with respect to the content and advisability of making this Agreement."  *Id.* Ex. H ¶¶ 16, 20(b).  If the parol evidence rule does not bar this claim merely because plaintiff alleges fraud in the execution, rather than fraud in the inducement, therefore, then it seems the fraud exception has swallowed the rule just the same.

**D.** **Conspiracy**

"In Pennsylvania, to state a cause of action for civil conspiracy, the following elements are required: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." *Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 313 (3d Cir. 2003) (citing *Strickland v. Univ. of Scranton*, 700 A.2d 979, 987-88 (Pa. Super. Ct. 1997)). Additionally, "[p]roof of malice, i.e., an intent to injure, is essential in proof of a conspiracy." *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 472 (Pa. 1979). Here, Batoff alleges that Topolinski and Charbonneau acted together to defraud him, that they engaged in an overt act by, for example, "fraudulently omit[ting] terms from the Mediated Settlement Agreement," and that he has suffered substantial damages as a result. FAC ¶¶ 153-55. Batoff further asserts that defendants acted in a "willful and wanton manner," so he has pleaded a prima facie claim for civil conspiracy. *Id.* ¶ 156.

In response, defendants argue that this claim is likewise barred by the "Subsequent Discovery of Different or Additional Facts" clause in the Settlement Agreement, and that the civil conspiracy count must fail if no underlying tort claim survives the motion to dismiss. Mot. Dismiss 19-20. However, Batoff's fraud count will move forward as a claim of fraud in the execution. *See supra* Part III.C.2. Moreover, the central holding in *Toy* is that a claim of fraud in the execution can rely on parol evidence despite the presence of an integration clause in the contract at issue. *Toy*, 928 A.2d at 206. If the mere addition of a "Subsequent Discovery" clause could close off that fraud exception in the manner that defendants suggest, *Toy* would be rendered a nullity. The "Subsequent Discovery" clause therefore cannot be read to foreclose this claim of conspiracy, as it is premised on a fraud in the execution claim that is exempt from the

19

parol evidence rule.  Accordingly, I will deny the motion to dismiss as to Count IV of the amended complaint.

### E.       Unjust Enrichment

Unjust enrichment requires a showing of: (1) "benefits conferred on defendant by plaintiff," (2) "appreciation of such benefits by defendant," and (3) "acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value."  *Filippi v. City of Erie*, 968 A.2d 239, 242 (Pa. Commw. Ct. 2009) (internal quotation marks omitted).  Batoff alleges that he transferred $11,000,000 and title to Bloomfield to defendants, that defendants have appreciated the benefit, and that their litigation against Chartis makes it unjust for defendants to retain these benefits in their entirety.  FAC ¶¶ 159-64.  Defendants respond first that this claim is barred by the "Subsequent Discovery" clause of the Settlement Agreement, and second that, as a matter of Pennsylvania law, Batoff cannot at the same time claim unjust enrichment and breach of contract.

"[I]t has long been held in this Commonwealth that the doctrine of unjust enrichment is inapplicable when the relationship between parties is founded upon a written agreement or express contract, regardless of how harsh the provisions of such contracts may seem in the light of subsequent happenings."  *Wilson Area Sch. Dist. v. Skepton*, 895 A.2d 1250, 1254 (Pa. 2006) (internal quotation marks omitted).  However, "[p]arties are indeed permitted to pursue alternative theories of recovery based on both breach of contract and unjust enrichment," but only if "there is any question as to the validity of the contract in question."  *AmerisourceBergen Drug Corp. v. Allscripts Healthcare, LLC*, No. CIV.A. 10-6087, 2011 WL 3241356, at *3 (E.D. Pa. July 29, 2011).  Here, Batoff claims fraud in the execution of the Settlement Agreement, and "[f]raud in the execution results in the agreement being void *ab initio*."  *Sw. Administrators, Inc.*

*v. Rozay's Transfer*, 791 F.2d 769, 774 (9th Cir. 1986) (citing 12 *Williston on Contracts* § 1489, at 341-42). The validity of the Settlement Agreement—including its "Subsequent Discovery" clause—is therefore in question, and so it would be premature to dismiss the unjust enrichment claim at this stage. I will accordingly deny the motion as to Count V of the amended complaint.

## IV.    CONCLUSION

Batoff has made out plausible claims against Charbonneau and Topolinski for breach of contract as to the Mediation Agreement (Count I), fraud in the execution (Count III), conspiracy (Count IV), and unjust enrichment (Count V). I will therefore allow those claims to proceed. However, Batoff's breach of contract claim as to the Settlement Agreement (Count II) and fraud in the inducement claim (Count III) fail as a matter of law, so I will grant the motion to dismiss with respect to those claims alone. An appropriate order follows.